IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-00047-BO

| | |
|---|---|
| **Christine Broom,** | |
| Plaintiff, | **Memorandum & Recommendation** |
| v. | |
| **Commissioner of Social Security**, | |
| Defendant. | |

Plaintiff Christine Broom, proceeding pro se, instituted this action on January 30, 2015, to challenge the denial of her application for social security income. Broom claims that Administrative Law Judge Christopher Willis omitted certain evidence from consideration and ignored some of the medical opinions submitted. She further contends that ALJ Willis failed to properly consider her conditions including depression, obsessive-compulsive disorder, muscle spasms, syncope episodes, wrist pain, and back pain. Both Broom and Defendant Carolyn Colvin, the Acting Commissioner of Social Security, have filed motions seeking a judgment in their favor. D.E. 20, 23.

After reviewing the parties' arguments, the court has determined that ALJ Willis reached the appropriate decision. There is substantial evidence to support ALJ Willis's consideration of the medical evidence, including the medical opinions and Broom's impairments. Therefore the undersigned magistrate judge recommends[1] that Broom's Motion for Judgment on the Pleadings

---

[1] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

be denied, that Colvin's Motion for Judgment on the Pleadings be granted, and that the Commissioner's final decision be affirmed.

## I. Background

### A. Procedural History

On October 15, 2012, Broom filed an application for supplemental security income on the basis of a disability that allegedly began on January 3, 2011. After her claim was denied at both the initial stage and upon reconsideration, Broom appeared before ALJ Willis for a hearing to determine whether she was entitled to benefits. After the hearing, ALJ Willis determined that Broom was not entitled to benefits because she was not disabled. Tr. at 21–33.

In his decision, ALJ Willis found that Broom had the following severe impairments: major depressive disorder, obsessive compulsive disorder ("OCD"), degenerative disc disease with chronic back pain, history of right upper extremity fracture, status post surgery with residuals, irritable bowel syndrome ("IBS"), dizziness/syncope episodes, and cognitive disorder. *Id.* at 23. ALJ Willis also found that her impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* at 23–26. ALJ Willis determined that Broom had the residual functional capacity ("RFC") to perform light work with the following limitations: she requires a sit/stand option allowing for position changes every 30 minutes; she can frequently push, pull, operate hand controls, handle and/or finger with the dominant right upper extremity; she can never climb ropes, ladders, or scaffolds but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she must avoid even moderate exposure to workplace hazards such as dangerous, moving machinery and unprotected heights; she can perform simple, routine, repetitive tasks; she can maintain concentration, persistence, and pace to stay on task for two hour periods over a typical eight hour workday; she requires a low-stress setting, meaning no

2

production-pace or quota-pace work but rather goal-oriented jobs primarily dealing with things as opposed to people; no more than occasional changes; and no more than occasional social interactions with supervisors and coworkers and no direct work with the public, such as sales or negotiations, though incidental or casual contact as it might arise during the workday is not precluded. *Id.* at 26.

ALJ Willis also concluded that Broom had no past relevant work but that, considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she was capable of performing. *Id.* at 31–32. These jobs included: office helper, mail clerk, and laundry folder. *Id.* at 32. Thus, ALJ Willis found that Broom was not disabled. *Id.* at 33. After unsuccessfully seeking review by the Appeals Council, Broom commenced this action and filed a complaint pursuant to 42 U.S.C. § 405(g) on January 30, 2015. D.E. 1-1.

### B.    Medical Evidence

Broom's medical history includes a June 2012 hospitalization for depression and suicidal ideation. Tr. at 373. Following her discharge, Broom obtained psychiatric care from Daymark Recovery Services. *Id.* at 399–422, 451–58. Broom was admitted to the hospital again in December 2012 because she was a danger to herself. *Id.* at 430. At a consultative exam with Dr. Sushma Kapoor on January 12, 2013, Broom reported back pain, depression, IBS, and memory loss. *Id.* at 445–49. Dr. Kapoor noted that Broom ambulated without difficulty and had full strength in all muscle groups, but had a decreased range of motion. *Id.* Dr. Kapoor opined that Broom could lift up to 30 pounds occasionally and 15 pounds frequently, and that she could stand, walk, and bend without limitation. *Id.* at 447.

3

Broom was again hospitalized in March 2013 after fainting. *Id.* at 489. An echocardiogram as well as CT scans of her abdomen and brain indicated normal results. *Id.* at 499–500, 502. Broom also sought consultation with a cardiologist for her recurrent syncope. *Id.* at 519–20.

She continued to report poor memory and obsessive-compulsive symptoms, including hand washing and a fear of germs. *Id.* at 521, 523, 599. Broom was diagnosed with a cognitive disorder in August 2013. *Id.* at 600. Testing showed significant degenerative changes in her lumbar spine and mild degenerative changes in her knees but normal results in her hips. *Id.* at 556–57.

Although Broom reported passing out and twisting her knee in January 2014, an x-ray of her knee was normal, her gait was normal, and a neurological exam was unremarkable. *Id.* at 586, 589, 593, 595. In March 2014, Broom stated that she did well on some days but that her condition was worsening. *Id.* at 607–08.

At the hearing, Broom testified that her wrists would swell with repetitive activities and that her fingers cramped when she carried things for long periods of time. *Id.* at 45. She also testified that she experienced depression, dizzy spells that resulted in falls, obsessive-compulsive activities, and low back pain for which epidural steroid injections no longer offered relief. *Id.* at 46–52.

## II.    Analysis

### A.    Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g);

4

*Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

**B.    Standard for Evaluating Disability**

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment then, at step four, the claimant's RFC is assessed to determine whether plaintiff can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C.    Medical opinion evidence

Broom asserts that ALJ Willis failed to consider opinion evidence offered by Dr. Andrew Bush, an orthopedist; Timothy Gast,[2] a certified physicians' assistant; Constance Page, a physicians' assistant; and Paige Gover, a physical therapist. Broom contends that all of these providers opined that she is unable to work. D.E. 21 at ¶ 1. As the Commissioner points out, most evidence from these providers was not in the record before the ALJ.[3] Instead, it was first submitted to the Appeals Council. The Appeals Council acknowledged this additional evidence and entered it as an exhibit but declined review of ALJ Willis's decision. Tr. at 1–6. The court concludes that this evidence does not warrant remanding the case for further consideration.

The Appeals Council must consider evidence submitted by a claimant with the request for review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." *Wilkins v. Sec'y, Dep't. of Health & Human Servs.*, 953 F.2d 93, 95–96 (4th Cir. 1991); 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1) ("The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision."). Evidence is new if it is not duplicative or cumulative; it is material if there is a "reasonable possibility that the new evidence would have changed the outcome of the case." *Wilkins*, 953 F.2d at 96. "[T]he Appeals Council must consider new and material evidence relating to that period prior to the ALJ decision in determining whether to grant review, even though it may ultimately decline review." *Id.* at 95.

---

[2] Broom asserts that Bush and Gast are orthopedic surgeons.

[3] The Appeals Council noted that evidence from Gover was not new because an exact copy of the submission was contained in the record at Exhibit B24F. Tr. at 4.

The Appeals Council does not, however, need to explain its reason for denying review of an ALJ's decision. *Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir. 2011); *Williams v. Colvin*, No. 5:12-CV-529, 2013 WL 4806965, at *3 (E.D.N.C. Sept. 9, 2013) (noting that the Appeals Council does not need to explain its reason for denying review of an ALJ decision) (citing *Meyer*, 662 F.3d at 702).

### 1. Gast

Gast's January 15, 2008 record noted that Broom has a chronic wrist condition. Tr. at 656. As a result, he opined that she would not be able to tolerate repetitive motion with her right hand. *Id.*

As a certified physicians' assistant, Gast qualifies as an "other source" as opposed to an "acceptable medical source." 20 C.F.R. § 1513. The same factors used to determine the weight to be accorded the opinions of physicians and psychologists (and other "acceptable medical sources") apply to the opinions of providers who are deemed to be at a different professional level (or so-called "other sources"). *See* S.S.R. 06–03p, 2006 WL 2329939, at *2, 4 (Aug. 9, 2006) (noting that information from other sources cannot establish the existence of a medically determinable impairment but may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.); *see also* 20 C.F.R. §§ 404.1527(c) (evaluation of medical opinions), 416.927(c) (same), 404.1513(d) (partial listing of "other sources"), 416.913(d)(1) (same).

In his decision, ALJ Willis considered a functional capacity evaluation ("FCE") that similarly limited Broom. *Id.* at 29, 637. ALJ Willis discounted the FCE because it was completed in October 2008, several years before the relevant time period at issue. *Id.* ALJ Willis further

observed that Broom consistently had full strength and manipulative functioning during all examinations. *Id.*

The treatment record from Gast predates the October 2008 FCE to which ALJ Willis gave limited weight because it was outside of the relevant time period and contradicted by other medical evidence. Because ALJ Willis rejected similar evidence, the additional record from Gast cannot be considered material inasmuch as there is not a reasonable possibility that it would have changed the outcome of the case. Moreover, it cannot be considered "new" inasmuch as the record existed prior to the hearing. Thus, Broom's motion seeking remand for further consideration based on this evidence lacks merit.

### 2. Bush

An April 16, 2009, letter from Dr. Bush noted that he was treating Broom for lumbar spondylolysis and lumbar stenosis. *Id.* at 662. He stated that these conditions may worsen in time and may also require surgical intervention. *Id.* He opined that Broom is unable to work in her present condition. *Id.* This evidence, however, does not form a basis to remand.

First, Dr. Bush's opinion falls well outside the relevant time period at issue before ALJ Willis. Accordingly, it is of limited value. Additionally, a medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone. *See* 20 C.F.R. § 404.1527(e)(1) (1998). Bush opined that Broom was unable to work as of April 2009. This legal opinion addresses the ultimate issue of disability, a determination reserved to the Commissioner. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492–93 (6th Cir. 2010) (unpublished); *Morgan v. Barnhart*, 142 F. App'x 716, 721–22 (4th Cir. 2005) (unpublished); 20 C.F.R. § 404.1527(d). Accordingly, Bush's opinion is not entitled to any

special weight, or to controlling weight, merely because it was issued by a treating physician. *See* 20 C.F.R. § 404.1527(e); S.S.R. 96–5p, 1996 WL 374183, at *2, 5 (July 2, 1996).

Given the limited value of Bush's letter in terms of both its timeliness and its substance, the court cannot conclude that it is material because not a reasonable possibility that it would have changed the outcome of the case. Like Gast's records, this evidence is not new inasmuch as it existed prior to the hearing before ALJ Willis. Consequently, remand is not warranted based on this evidence.

### 3. Page

In Page's letter dated May 7, 2014, she stated that Broom was being treated for degenerative disc disease and arthritis. Tr. at 676. She opined that Broom is "unable to lift more than 10 pounds or perform overhead work or pushing or pulling." *Id.* She further noted that Broom reported difficulty standing or sitting for  more than 30 minutes at a time. *Id.* This evidence does not meet the standard to remand the case for further consideration.

This evidence does not qualify as "new" inasmuch as it was available, but not submitted, before either the hearing or the decision. Nonetheless, ALJ Willis found that Broom's degenerative disc disease was a severe impairment. *Id.* at 23. ALJ Willis also credited Broom's limitations in sitting and standing by proving for a sit/stand option in the RFC which permitted her to change positions every 30 minutes. *Id.* at 26. Thus, these portions of Page's letter cannot be considered material as they would not change the outcome of the disability determination. With respect to Page's limitations in overhead reaching as well as pushing and pulling, Page provides no evidentiary support for these limitations. Like Gast, Page, as a physicians' assistant, does not qualify as an "acceptable medical source." Accordingly, the court cannot find that such

limitations would reasonably change the outcome of the case. Being neither new nor material, this evidence does not form a basis for remand.

### 4. Gover

Broom submitted records from physical therapist Gover dated October 20, 2008. As the Appeals Council noted, this evidence was identical to evidence already in the record. *Id*. at 4; Ex. B24F at 19–20, 26. ALJ Willis specifically discussed this evidence and gave it limited weight. Tr. at 29. He noted that Gover was not an acceptable medical source and that the evidence predated Broom's alleged onset date by several years. *Id.* Accordingly, this evidence fails to qualify as either new or material. Consequently, Broom's argument that ALJ Willis failed to consider this evidence is without merit.

### 5. Gadipudi

Broom also cites evidence from Dr. Venugopal Gadipudi, a neurologist, which she argues was ignored. D.E. 26 at ¶ 2. Broom contends that Dr. Gadipudi found nerve damage in both of her legs. *Id.* Remand is not warranted based on these records because they are neither new nor material.

Dr. Gadipudi performed a neurological consultation of Broom in May 2010. Tr. at 352–355. He diagnosed lumbago and lumbar radiculopathy, as well as muscle spasms and strain. *Id.* at 353. He also performed nerve conduction tests in June 2010, which indicated mild peripheral neuropathy. *Id.* at 354. While clinical correlation was recommended, there is no record indicating that it was pursued. Moreover, Dr. Gadipudi also noted that peroneal, tibial, and sural nerve studies were normal. *Id.*

Broom fails to articulate how Dr. Gadipudi's findings undermine ALJ Willis's determination. Dr. Gadipudi's diagnosis does not correspond to Broom's functional abilities. It is

10

well-settled that a mere diagnosis is not sufficient to show that the condition is disabling; in addition, "[t]here must also be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Moreover, these records prior to the hearing and predate the relevant period at issue. However, even if these records had been made part of the record before ALJ Willis, Further, because an ALJ is not required to provide a written evaluation for every document in the record, ALJ Willis's failure to cite Dr. Gadipudi's treatment records would not be error. *See Brittain v. Sullivan*, No. 91–1132, 1992 WL 44817, *6 (4th Cir. Mar. 11, 1992) (unpublished) ("An ALJ need not comment on all evidence submitted."); *Brewer v. Astrue*, No. 7:07–CV–24, 2008 WL 4682185, at *3 (E.D.N.C. Oct. 21, 2008) (unpublished) ("While the ALJ must evaluate all of the evidence in the case record, the ALJ is not required to comment in the decision on every piece of evidence in the record, and the ALJ's failure to discuss a specific piece of evidence is not an indication that the evidence was not considered.").

Broom does not identify functional limitations identified by Dr. Gadipudi. As the records are neither new nor material, this evidence provides no basis warranting remand. Accordingly, Broom's argument should be rejected.

**D.      State agency consultants**

Broom next questions the dates of reports issued by state agency consultants, Drs. Frank Virgili, Jonathan Mayhew, and Nancy Herrera. Broom contends that the dates are years earlier than the reports cite and thus do not reflect her current status. D.E. 21 at ¶ 11; D.E. 26 at ¶ 1. Dr. Virgili's assessment is dated July 1, 2013. Dr. Mayhew's opinion is dated February 25, 2013. Dr. Herrera's findings are dated June 27, 2013.  Broom, however, asserts that Dr. Virgili opinion actually dates back to February 18, 2009, and that Dr. Herrera's opinion dates back to March 11, 2009. *Id.*

Despite Broom's wholly unsubstantiated allegations that these dates are incorrect and that these consultants issued opinions regarding her condition back in 2009, the evidence is clear that the dates correctly correspond to her condition in 2013. The assessments reflect that these consultants reviewed evidence generated after 2009, up to and including 2013. Tr. 92–107, 109–127. Clearly, the state agency consultants could not have issued opinions in 2009 citing medical evidence from 2013. Accordingly, this issue is wholly without merit.

E.      **Broom's medical conditions**

Broom also argues that ALJ Willis failed to give proper consideration to several of her medical conditions and that he did not understand the nature of these conditions. The Commissioner submits that ALJ Willis properly considered the medical evidence of Broom's many conditions. The court concludes that substantial evidence supports ALJ Willis's consideration of all of Broom's conditions.

### 1. Obsessive compulsive disorder

Broom asserts that ALJ Willis did not understand the nature of OCD. D.E. 21 at ¶ 4. She asserts that he limited her OCD to constant hand-washing and an inability to use public restrooms. *Id.*; tr. at 47. She contends that he "completely ignored" her OCD issues, which make it impossible for her to leave the house. D.E. 26 at ¶ 9.

In his decision, ALJ Willis found that her OCD was a severe impairment. Tr. at 23. He also noted her testimony relating that her OCD caused her to constantly wash her hands due to her fear of germs. *Id.* at 27. This finding reflected mental health treatment notes which observed her OCD symptoms in the nature of frequent hand-washing due to fear of germs in April 2013. *Id.* at 28, 521. It is clear that ALJ Willis not only considered her OCD but discussed it and found that it had more than a minimal impact on her ability to perform basic work activities. Moreover,

12

despite her claims of being unable to leave the house, Broom attended appointments, saw her mental health counselor at Daymark Recovery Services on a monthly basis, and attended weekly group therapy sessions. Tr. at 47–48. She also testified that, on an average day, she may go outside. *Id.* at 52. Accordingly, the evidence undermines her present claims. Finding no error in ALJ Willis's consideration of Broom's OCD, this argument offers her no relief.

### 2. Wrist

Broom also submits that she has a documented history of DeQuervian's Tenosynovitis in her right dominant hand and, consequently, she is unable to perform repetitive motions. D.E. 21 at ¶ 5. She asserts that both Gover and Gast examined her wrist a few days after her FCE was performed and they noted swelling and tenderness caused by repetitive tasks. D.E. 26 at ¶ 3.

ALJ Willis noted that Broom testified about her ongoing difficulties with her right hand. Tr. at 27, 45. He further observed that she stated she had difficulty opening jars and unscrewing caps, and that her wrist would swell with repetitive chores. *Id.* He also noted that Broom testified that if she carries objects for a long period of time, her fingers begin cramping. *Id.*

ALJ Willis noted that medical records demonstrated that in October 2008, Broom reported right hand pain due to a fracture that occurred in 1992. *Id.* at 28. Since her onset date, medical records showed that Broom reported no pain or limitations with her right upper extremity in January 2013. *Id.* at 29. She was also able to perform fine and gross manipulations, she had full range of motion is her wrists and hands, and she had full strength in both upper extremities. *Id.* ALJ Willis concluded that "[d]espite the minimal objective evidence of functional limitation in the right upper extremity during the period at issue," he accommodated Broom's hearing testimony regarding manipulative limitations. *Id.* As noted above, the RFC for

light work was further limited her, *to wit.*, she could only frequently push, pull, use hand controls, handle and finger with her right dominant upper extremity. *Id.* at 26, 30.

Clearly, then, ALJ Willis not only considered her wrist condition but credited her subjective limitations, in part. Broom does not identify medical evidence establishing further functional loss with respect to her right wrist. For these reasons, her argument on this issue lacks merit.

### 3. Back pain and muscle spasms

Broom next states that she received epidural steroid injections in the past but they are no longer are effective in relieving her back pain. D.E. 21 at ¶ 6. As the Commissioner argues, ALJ Willis properly evaluated this condition.

As noted above, ALJ Willis found that her chronic back pain was a severe condition. Tr. at 23. ALJ Willis noted Broom's testimony wherein she stated that injections no longer helped her lower back pain and muscle spasms. *Id.* at 27. She also stated that she had muscle spasms on a regular basis. *Id.* at 62.[4] Although she was able to perform household chores, she testified that she required breaks during the day to rest her back and legs. *Id.* at 27.

ALJ Willis remarked that the medical evidence demonstrated that Broom reported that her chronic pain was a stressor for her. *Id.* An MRI of her lumbar spine in February 2009, showed mild broad-based disc bulges and mild neural foraminal narrowing from L3–S1. *Id.* at 28–28. ALJ Willis observed that, at a January 2013 consultative exam, Broom had some decreased range in her cervical and lumbar spines but that she had a negative straight leg raise and normal gait. *Id.* at 29. Dr. Sushma Kapoor, a consultative examiner, opined that she could

---

[4] Broom testified that her shaking was due to anxiety and as well as muscle spasms. Tr. at 62.

occasionally lift and carry 30 pounds and could frequently lift and carry 15 pounds. *Id.* at 447. Dr. Kapoor assessed no limitations in Broom's ability to stand, walk, or bend. *Id.*

ALJ Willis also remarked that Broom's pain was managed conservatively. *Id.* at 29. In August 2013, Broom rated her back pain as 1/10. *Id.* X-rays of Broom's lower spine showed multilevel degenerative changes with levoscoliosis. *Id.* Treatment records from October 2013 noted an antalgic gait and difficulty standing from a seated position, but full strength and sensation in the lower extremities. *Id.* Treatment records from providers in January 2014 and March 2014 found normal gait and posture, full range of motion, and full strength throughout her body. *Id.*

ALJ Willis determined that Broom was capable of a limited range of light work and provided her with a sit/stand option. *Id.* at 26, 29. Despite Dr. Kapoor's assessment, ALJ Willis found that Broom had more limitations because of her spinal impairment and pain. *Id.* at 29–30. He additionally limited her to only occasional postural activities with no climbing of ropes, ladders, and scaffolds. *Id.* at 30. In doing so, ALJ Willis credited Broom's subjective complaints.

Given ALJ Willis's consideration and discussion of the evidence concerning Broom's back pain, his decision makes clear that this condition was not only properly evaluated but also largely accepted given the correlating limitations in the RFC. As Broom has not demonstrated what additional limitations were established by medical record but not considered, her argument on this issue fails and should be rejected.

### 4. Depression

Broom asserts that she was involuntarily committed to a mental hospital for depression and suicidal thoughts in June 2012 and December 2012. Broom contends that she was again hospitalized for depression in July 2014, after ALJ Willis issued his decision. D.E. 21 at ¶ 7;

D.E. 26 at ¶ 9. She maintains that her mood is constantly changing and that she cannot leave the house on some days. D.E. 26 at ¶ 9. She also contends that she requires continuous therapy on a weekly basis. D.E. 21 at ¶ 7. Despite Broom's argument, ALJ Willis properly considered her mental health condition.

ALJ Willis found that Broom's major depressive order was a severe impairment. Tr. at 23. He also evaluated her mental health conditions under Listings 12.02, 12.04, and 12.06. *Id.* at 25. He determined that she did not meet these Listings as she met neither the paragraph B nor paragraph C criteria. He further noted that "repeated episodes of decompensation" means three episodes within one year, each lasting for at least two weeks. *Id.* Broom, however, had only one to two episodes episodes of decompensation within one year. *Id.* Additionally, these hospitalizations were less than two weeks in length. *Id.* at 27–28.

ALJ Willis also noted Broom's hearing testimony regarding her mental health. She testified that her depression worsened in December 2012 when her daughter was dismissed from school for having a gun in her car. *Id.* at 27. She also testified that she had memory loss and she had socially withdrawn. *Id.* ALJ Willis found, however, that Broom's mental status improved as her situational stressors stabilized and she received medication and therapy. *Id.* He noted that the medical evidence showed she was hospitalized for five days in June 2012 for depression and suicidal ideations. Upon discharge she had no psychotic symptoms. *Id.* Broom received treatment at Daymark Recovery Services. *Id.* Situational stressors of financial difficulties leading to her prior divorce were reported. *Id.*

Broom was hospitalized in December 2012 following her daughter's arrest for possession of a firearm on a college campus. *Id.* at 28. During her three day stay, she was treated with medication and her GAF score improved from 30 to 55. *Id.* By February 2013, Broom reported

she was more positive, and both her mood and affect had improved. *Id.* ALJ Willis observed that Broom's remaining mental health records reflected some difficulties with memory but otherwise stable functioning when she received treatment. *Id.* The most recent medical records prior to the hearing indicated that Broom continued to experience anxiety and depression but that her affect was improved and her mood was stable. *Id.*

ALJ Willis further noted state agency psychological examiners Drs. Mayhew and Herrera offered opinions on Broom's mental residual functional capacity. *Id.* at 30. ALJ Willis gave significant weight to the opinions that Broom could perform simple, routine, repetitive tasks with limited public contact and limited interpersonal contact. *Id.* AJ Willis again noted that Broom's "signs and symptoms stabilized and improved as medication and therapy helped her deal with situational stressors." *Id.* Additionally, the RFC accounted for her mental health conditions by limiting her to simple, routine, repetitive tasks, which addresses her issues with memory; limited public and interpersonal contact, which addresses her social issues; and a low-stress work setting, which addresses her difficulty in handling stress. *Id.*

In light of such conclusions by ALJ Willis, it is clear that he considered, addressed and incorporated Broom's mental health conditions into his decision and the RFC determination. Broom's mental health hospitalization following ALJ Willis's decision, records for which she appears not to have included in the submission to the Appeals Council, would not undermine the disability determination inasmuch as it post-dates the decision and does not address her status during the relevant time period. Moreover, being more than 12 months beyond her prior mental health hospitalizations, the post-decision hospitalization, without more, cannot establish "repeated episodes of decompensation." Therefore, the court cannot conclude that a subsequent

hospitalization for mental health treatment would warrant remand. Consequently, her argument on this issue should be rejected.

### 5. Syncope

Broom contends that she suffers from episodes of syncope, the cause of which has not been determined. D.E. 21 at ¶ 8. She states that this condition is dangerous and causes her to fall. *Id.* As a result of such falls, Broom states that she has suffered a gash on her head, dislocated her knee, which caused swelling, and broken a rib. D.E. 26 at ¶ 4. She maintains that this condition presents a liability that will prevent employers from hiring her. *Id.* She asserts that ALJ Willis erred in failing to mention this condition to the Vocational Expert ("VE"). *Id.* The court finds that ALJ Willis properly considered this condition.

In his decision, ALJ Willis stated that he considered Broom's dizziness/syncope episodes under Listing 11.00 (neurological system). Tr. at 24. He determined that the evidence fell short of the criteria for the Listings and that no medical source mentioned findings equivalent in severity to the criteria for any Listings. *Id.* ALJ Willis also cited Broom's testimony wherein she stated that she has dizzy spells. *Id.* at 27. She testified that such spells usually went away but that she had fallen on four occasions. *Id.* at 48. Her most recent dizzy spell was 2–3 months prior to the hearing. *Id.* at 27, 48.

ALJ Willis noted that Broom's dizziness was intermittent and that her syncopal episodes were rare. *Id.* at 29. The medical record shows that Broom was hospitalized on March 18, 2013, after fainting while taking out the trash. *Id.* at 489. An echocardiogram as well as CT scans of her abdomen and brain were normal. *Id.* at 499–500, 502. She sought consultation at Cary Cardiology on April 16, 2013, for her recurrent syncope and she was to be monitored for one month. *Id.* at 519–20. Broom reported passing out and twisting her knee on January 14, 2014. *Id.*

18

at 586. A neurological exam as well as an x-ray of her knee were normal, and she had a normal gait. *Id.* at 589, 593, 595. ALJ Willis noted that subsequent treatment records reflected complaints of intermittent dizziness but no further falls. *Id.* at 29.

The record demonstrates that ALJ Willis properly considered this condition. ALJ Willis noted Broom's testimony and the medical evidence regarding her dizziness and syncopal episodes. Moreover, ALJ Willis credited this condition when formulating the RFC. Due to her dizziness and syncopal episodes, ALJ Willis restricted her RFC by requiring her to avoid even moderate exposure to hazards, including dangerous, moving machinery and unprotected heights. *Id.* at 26, 30. These limitations were included in the hypothetical questions to the VE. *Id.* at 55.

Broom has not identified further limitations or restrictions that are supported by the objective medical evidence. Given ALJ Willis's evaluation of this condition and the correlating limitations he incorporated into her RFC, the court is unable to conclude that the analysis was improper as Broom contends. Consequently, her argument on this issue is unsupported and should be rejected.

### F. Sit/stand option

Broom next asserts that ALJ Willis erred by including a sit/stand option in the RFC. D.E. 21 at ¶ 2. Specifically, she argues that the Dictionary of Occupational Titles ("DOT") does not provide for a sit/stand option. *Id.* Broom also maintains that her vocational rehabilitation file was closed because of her health which, she claims, supports her position that she is unable to work. *Id.* Broom's argument provides no basis to warrant remand.

In pertinent part, S.S.R. 83–12 provides the following guidance to an ALJ when making a disability determination for a claimant requiring a sit/stand option:

In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for a while before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

There are some jobs in the national economy—typically professional and managerial ones—in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a [VE] should be consulted to clarify the implications for the occupational base.

SSR 83–12, 1983 WL 31253, at *4 (Jan. 1, 1983). Thus, although the DOT does not contemplate a sit/stand option, S.S.R. 83-10 acknowledges that there are jobs that allow sit/stand options. It directs the agency to consult with a VE to assess the impact of that option on the occupation base.

Here, ALJ Willis specifically asked the VE about the reduction in job numbers for the sit/stand option. Tr. at 57. When questioning the VE, ALJ Willis specifically asked whether there were conflicts between his testimony and the DOT. *Id.* at 57. The VE stated there were no conflicts but noted that the DOT did not contain information about a sit/stand option. *Id.* The VE further stated that his information about the sit/stand came from his training and experience. *Id.* The VE also testified that the job numbers he identified reflected a reduction for the sit/stand option. *Id.* Accordingly, the VE's testimony comports with S.S.R. 83-10.

Broom's reliance on a May 9, 2014 letter from her vocational rehabilitation counselor, Juanita Hooker, does not undermine the VE's testimony. Tr. at 676. Despite Broom's position that Ms. Hooker closed her file because of her health, the letter indicates that Broom did not meet the criteria of eligibility for vocational rehabilitation services. Nothing it the letter indicates that Ms. Hooker found that Broom could not receive services based on her poor health. Consequently, this evidence does not discredit the other evidence, including testimony from the VE, of the availability of suitable work.

Broom also asserts, incorrectly, that ALJ Willis ignored the VE's testimony regarding the availability of jobs for an individual who would require attendance at group therapy once a week. D.E. 26 at ¶ 11. The purpose of a VE is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). As such, hypothetical questions posed to a VE must accurately set forth all of a claimant's physical and mental impairments. *Id.* "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." *Pratt v. Sullivan*, 956 F.2d 830, 836 (8th Cir. 1992). The corollary to this rule is that the ALJ need only include in her questioning those impairments which the ALJ has found to be credible. *See Johnson*, 434 F.3d at 659 (holding a hypothetical valid because it adequately reflected claimant's characteristics as found by the ALJ). If the ALJ does not believe that a claimant suffers from one or more claimed impairments, and substantial evidence supports that conclusion, then the ALJ does not err if she fails to include those impairments in her questioning of the VE. *Sobania v. Sec'y, Health & Human Servs.*, 879 F.2d 441 (8th Cir. 1989) (explaining "the hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ"); *McPherson v. Astrue*, 605 F.

Supp. 2d 744, 761 (S.D.W. Va. 2009) ("The ALJ is under no duty to present the VE with hypothetical questions that include [claimant's] claimed impairments if the ALJ has found those impairments to be not severe or not credible.").

ALJ Willis asked the VE if there were jobs available for an individual would miss work more than two days per month due to impairments or treatment for impairments. Tr. at 60. The VE testified that such a limitation would eliminate all work. *Id.* Despite such testimony, however, ALJ Willis did not incorporate a weekly absenteeism for group therapy into Broom's RFC. Accordingly, this testimony elicited from the VE did not address Broom's well-supported limitations as articulated in the RFC. Consequently, ALJ Willis did not err in failing to credit the VE's testimony with respect to this hypothetical question.

As ALJ Willis did not improperly rely on the VE's testimony regarding the sit/stand option, Broom's argument on this issue lacks merit and should be rejected.

### G. Global Assessment of Functioning ("GAF") scores

Broom also argues that ALJ Willis erred by considering her low GAF scores. She identifies a June 21, 2012 score of 20; a June 28, 2012 score of 35; an August 15, 2012 score of 45; a December 25, 2012 score of 30; a December 28, 2012 score of 55; and a January 2, 2013 score of 30. The Commissioner asserts that ALJ Willis properly considered the range of Broom's GAF scores contained in the record. The court determines that the ALJ's determination is without error.

The GAF scale measures a person's overall psychological, social, and occupational functioning. Am. Psych. Assn., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) ("DSM–IV–TR"). The SSA has stated that GAF scores "[do] not have a direct correlation to the severity requirements in [the social security] mental disorders listings."

*Wiggins v. Astrue*, No. 5:11–CV–85–FL, 2012 WL 1016096, at *8 (E.D.N.C. Feb. 2, 2012)

(unpublished) (quotations and citations omitted). Moreover, GAF scores themselves are not

necessarily indicative of a claimant's mental disability. *See Oliver v. Comm'r of Soc. Sec.*, 415 F.

App'x 681, 684 (6th Cir. 2011) ("A GAF score is thus not dispositive of anything in and of

itself" and has no direct legal or medical correlation to the severity requirements of social

security regulations.); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009) (a GAF

score is "a subjective determination that represents the clinician's judgment of the individual's

overall level of functioning."); *Leovao v. Astrue*, No. 2:1-cv-54, 2012 WL 6189326, *5

(W.D.N.C. Nov. 14, 2012) (a GAF score is intended to be used to make treatment decisions)

(citing *Wilkins v. Barnhart*, 69 F. App'x. 775, 780 (7th Cir. 2003)); *Fowler v. Astrue*, No, 1:10-

cv-273, 2011 WL 5974279 * *3 (W.D.N.C. Nov. 29, 2011) (a GAF score is only a "snapshot of

functioning at any given moment."); *Melgarejo v. Astrue*, No. 08–3140, 2009 WL 5030706, at *

2 (D. Md. Dec. 15, 2009) ("[A] GAF score is not determinative of whether a person is disabled

. . . [and] [t]he Social Security Administration does not endorse the use of the GAF in Social

Security and SSI disability programs, and it does not directly correlate to the severity

requirements in the mental disorders listings."). "[T]he failure to reference a [GAF] score is not,

standing alone, sufficient ground to reverse a disability determination." *Wiggins,* 2012 WL

1016096, at *8 (quotations and citations omitted).

    The relevant GAF scores assigned to Broom ranged from 20 to 55.[5] ALJ Willis cited her

December 2012 GAF scores and noted, in detail, her mental health conditions and treatment

---

[5] A GAF score between 11–20 suggests "some danger of hurting self or others or occasionally
fails to maintain minimal personal hygiene or gross impairment in communication." DSM-IV-
TR at 34. Scores between 21–30 indicate that "behavior is considerably influenced by delusions
or hallucinations or serious impairment, in communication or judgment or inability to function in

during the relevant time period. Tr. at 26, 28, 30–31. Although he did not mention every GAF

score, ALJ Willis properly considered Broom's GAF scores along with all of the record evidence

of her mental health.

Additionally, ALJ Willis accounted for Broom's well-established mental deficits and

resulting limitations in the RFC, which limited her to simple, routine, repetitive tasks;

maintenance of concentration, persistence, and pace for two-hour periods; limited to a low-stress

setting, meaning no production-pace or quota-pace work; no more than occasional changes; and

no more than occasional social interactions with supervisors and coworkers and no direct work

with the public. *Id.* at 26. Accordingly, he properly considered the evidence of her mental

functioning and abilities. Thus, the undersigned determines that ALJ Willis did not err in

evaluating Broom's GAF scores. Her argument on this issue, therefore, lacks merit.

### H.     ALJ bias

Finally, Broom contends that ALJ Willis was biased because he considered only selected

documentation and omitted other, competent medical documentation. To the extent that she

argues that the ALJ only considered selective portions of the record and "cherry-picked"

evidence that supported his opinion, a review of the ALJ's decision indicates otherwise. In his

decision, ALJ Willis specifically stated that he made his findings "[a]fter careful consideration of

the entire record[.]" Tr. at 23. He later stated again that he had carefully considered the evidence.

*Id.* at 27.

---

almost all areas." *Id.* At 31–40, a GAF score is indicative of "some impairment in reality testing
or communication or major impairment in several areas, such as work or school, family relations,
judgment, thinking, or mood." *Id.* A GAF score from 41–50 reflects "[s]erious symptoms (e.g.,
suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in
social, occupational, or school functioning." *Id.* A score from 51–60 indicates "moderate
symptoms or moderate difficulty in social, occupational, or school functioning." *Id.*

Although an ALJ needs to indicate the weight given to evidence so that a reviewing court can determine if the findings are supported by substantial evidence, *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984), an ALJ is not required to address every piece of evidence in the record, so long as a reviewing court can determine from the opinion "what the ALJ did and why he did it." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n. 10 (4th Cir. 1999)). *See also Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (stating that the ALJ need not specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection rendering the court unable to conclude that the ALJ considered the claimant's medical condition as a whole); *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). Despite Broom's claims, as discussed above, ALJ Willis properly considered the evidence. What additional evidence was not considered, aside from that discussed above, Broom has not identified. Finding no error with ALJ's consideration of the medical evidence, Broom's claim on this issue should be rejected.

## III.    Conclusion

For the forgoing reasons, the court recommends that Broom's Motion for Judgment on the Pleadings (D.E. 20) be denied, that Colvin's Motion for Judgment on the Pleadings (D.E. 23) be granted, and that the Commissioner's final decision be affirmed.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel.  Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation.  The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the

Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

Dated: November 17, 2015.

ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE